**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Trina Devay HARPER, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Aziz SHARRIEFF, Defendant–Appellant.**

Nos. 93–50527, 93–50717.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1994.

Decided Aug. 30, 1994.

Michael I. Garey, Paul G. Stark, Goldfein & Stark, Santa Ana, CA, for defendants-appellants.

Clare S. Phillips, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: FLETCHER, CANBY and
HALL, Circuit Judges.

CANBY, Circuit Judge:

Trina Devay Harper and Aziz Sharrieff appeal their convictions for conspiracy in violation of 18 U.S.C. § 371, attempted bank robbery in violation of 18 U.S.C. § 2113(a), and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). Harper and Sharrieff both assert that the district judge denied them their right to exercise the full complement of peremptory challenges allotted them by statute and that there was insufficient evidence to support any of the verdicts. Harper additionally challenges the district court's jury instructions and its application of the United States Sentencing Guidelines.

We reverse the attempt convictions, affirm the other convictions and remand for resentencing.

## BACKGROUND

Police officers in Buena Park, California found appellants and one other codefendant, Carlos Munoz, sitting in a rented car in the parking lot of the Home Savings Bank shortly after 10:00 p.m. on the evening of September 21, 1992. The officers searched the defendants, the vehicle and the surrounding area. They found two loaded handguns—a .44 caliber Charter Arms Bulldog and a .357 magnum Smith and Wesson—under a bush located five or six feet from the car, where a witness had earlier seen one of the car's occupants bending over. In the car, the police discovered a roll of duct tape in a plastic bag, a stun gun, and a pair of latex surgical gloves. They found another pair of latex surgical gloves in the pocket of Munoz's sweat pants. They also found six rounds of .357 magnum ammunition in the pocket of his shorts, which he wore under his sweat pants. Some of this ammunition came from either the same box or the same lot as the ammunition in the loaded .357 magnum handgun. The defendants had a total of approximately $182 in cash among them and Sharrieff was

carrying an automated teller machine (ATM) card which bore the name of Kimberly Ellis.

Harper had used the ATM card belonging to Kimberly Ellis shortly before 9:00 p.m. that evening in an ATM at the Buena Park branch of the Bank of America, which was located adjacent to the Home Savings parking lot in which the defendants were parked. The ATM's camera photographed Harper. Harper had requested a twenty dollar withdrawal from the ATM, but had not removed the cash from the cash drawer. This omission had created what is known as a "bill trap." When a bill trap occurs, the ATM shuts itself down and the ATM supply company that monitors the ATM contacts its ATM service technicians to come and repair the ATM.[1] These facts were known to Harper, who had previously worked for both Bank of America and one of its ATM service companies.

On the basis of this evidence, Harper, Sharrieff and Munoz were indicted for conspiracy to rob a federally insured bank, attempted bank robbery, and carrying a firearm during and in relation to a crime of violence. The prosecution's theory was that Harper had intentionally caused the bill trap to summon the ATM service technicians who would have to open the ATM vault to clear the trap. At that time, the theory went, the defendants planned to rob the technicians of the money in the ATM. The three defendants were convicted of all charges.

## DISCUSSION

### I. Peremptory Challenges

■ Prior to the voir dire examination of the jury venire, the district judge explained to counsel that she uses the "Arizona blind strike" method of jury selection. Under that system, the venire members are numbered beginning with the number one. After the venire members to be excused for cause are excused, the prosecution and the defense simultaneously list their peremptory challenges on pieces of paper without knowing which venire members the other side is chal-

---

1. Service technicians are on call until 10:00 p.m. to service the ATM's. Their response time gener-

ally is from forty-five to ninety minutes.

lenging. The judge then eliminates the subjects of the peremptory challenges and selects the twelve lowest numbered remaining venire members as the jury. The judge explained that, because she would seat two alternate jurors (with the next lowest numbers) the defense would be entitled to eleven peremptory challenges. *See* Fed.R.Crim.P. 24(c).

Following voir dire and the excuse of venire members for cause, the judge instructed the prosecutor and defense counsel to list their peremptory challenges on forms supplied by the court. The court did not reiterate its earlier instructions regarding the jury selection method or the number of peremptory challenges available to each side. The forms the court supplied for listing the challenges, however, had the proper number of blank lines for each side: six for the prosecution and ten for the defense, with an additional blank line on each entitled "Alternates." Each side then completed the forms; the three defense attorneys passed the sheet back and forth among themselves while making strikes. Neither the government nor the defense filled in the additional blank to utilize the extra peremptory challenge afforded each for the alternate jurors in accordance with Fed.R.Crim.P. 24(c).

When the peremptory challenge lists were complete, the judge selected the jury panel and alternates and announced the results to counsel. At that point, defense counsel announced that they had inadvertently failed to list one additional strike of a particular juror; they requested that that juror be stricken. The judge refused, stating that the request came too late because the names of the jury members had been revealed. Harper and Sharrieff now argue that their convictions must be overturned because the district court did not allow them to exercise the full complement of peremptory challenges permitted by Fed.R.Crim.P. 24(b) & (c).

The district judge did not err. The blind-strike system she employed permitted the defendants to exercise the full number of peremptory challenges authorized by law, and the defendants were fully informed of the nature of the system. *See United States v. Turner*, 558 F.2d 535, 538 (9th Cir.1977) (district court may not unduly restrict defendant's use of challenges, and must give adequate notice of system utilized). The defendants' complaint is that the court declined to relieve them of the consequences of their own error. To permit the defendants to exercise their peremptory challenge after the court had announced the composition of the jury, however, would have partially defeated the purpose of the blind-strike system. The district court was not compelled to accept such a result.

Our holding in *Turner* is not to the contrary. In *Turner*, the district judge, who was employing a "jury-box" system of challenges, had failed to notify the defendants that each time that they accepted a jury as empaneled, they were exhausting one peremptory challenge. We held that this failure to notify was error, and that the rule itself was improper: although a defendant's acceptance of a jury might preclude him from challenging members accepted, it did not waive challenges of future replacement jurors. *Turner*, 558 F.2d at 538. Neither of the errors committed in *Turner* occurred in the present case. Accordingly, neither *Turner* nor the other authority relied on by Harper and Sharrieff requires reversal here.[2]

## II. Sufficiency of the Evidence

Harper and Sharrieff assert that there was insufficient evidence to support their convictions for the charged offenses. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We conclude that there was insufficient evidence to support the attempt convictions, but that there

---

**2.** We also do not read the two out-of-circuit cases appellants cite, *United States v. Ruuska*, 883 F.2d 262 (3d Cir.1989), and *United States v. Ricks*, 776 F.2d 455 (4th Cir.1985), *superseded by* 802 F.2d 731 (4th Cir.1986) (en banc), as standing for the proposition that district judges in all instances must allow defendants to correct errors that they make in the exercise of their peremptory challenges.

was sufficient evidence to support the conspiracy and firearm convictions.

## A. Attempted Bank Robbery

■ To obtain a conviction for attempted bank robbery the prosecution must prove (1) culpable intent and (2) conduct constituting a substantial step toward the commission of the crime. *United States v. Still,* 850 F.2d 607, 608 (9th Cir.1988), *cert. denied,* 489 U.S. 1060, 109 S.Ct. 1330, 103 L.Ed.2d 598 (1989); *United States v. Buffington,* 815 F.2d 1292, 1301 (9th Cir.1987). Here, there was sufficient evidence to permit a jury to find that the defendants intended to rob the Bank of America. We conclude, however, that under the law of this circuit there was insufficient evidence that the defendants took a substantial step toward commission of the robbery.

It is admittedly difficult to draw the line between mere preparation to commit an offense, which does not constitute an attempt, and the taking of a substantial step toward commission of the crime, which does. Various theories have been propounded for determining when the activities of one who intends to commit a crime ripen into an attempt, *see* 2 W. LaFave & A. Scott, *Substantive Criminal Law,* § 6.2 at 31–39 (1986), and they yield varying results in a case like this. We must draw our guidance from our own precedent, however, and we conclude that the activities of the defendants, viewed in the light most favorable to the prosecution, fail to qualify as an attempt.

Our primary authorities are *Buffington* and *Still.* In *Buffington,* the defendants had driven past the supposed target bank twice. One of the three male defendants then entered a store near the bank and observed the bank. The two other defendants, one dressed as a woman, exited their vehicle in the bank parking lot, stood near the vehicle and focused their attention on the bank. They were armed. We held that the evidence was insufficient both as to the defendants' intent to rob the bank, and as to the existence of conduct constituting a substantial step towards the commission of the

crime.[3] With regard to the latter element, we observed:

> Not only did appellants not take a single step toward the bank, they displayed no weapons and no indication that they were about to make an entry. Standing alone, their conduct did not constitute that requisite "appreciable fragment" of a bank robbery, nor a step toward commission of the crime of such substantiality that, unless frustrated, the crime would have occurred.

*Id.,* 815 F.2d at 1303 (footnote omitted).

The same may be said of the defendants in this case. True, Harper had left money in the ATM, causing a bill trap that would eventually bring service personnel to the ATM. That act, however, is equivocal in itself. The robbery was in the future and, like the defendants in *Buffington,* the defendants never made a move toward the victims or the Bank to accomplish the criminal portion of their intended mission. They had not taken a step of "such substantiality that, unless frustrated, the crime would have occurred." *Id.* Their situation is therefore distinguishable from that of the defendant in *United States v. Moore,* 921 F.2d 207 (9th Cir.1990), upon which the government relies. In *Moore,* the defendant was apprehended "walking toward the bank, wearing a ski mask, and carrying gloves, pillowcases and a concealed, loaded gun." *Id.* at 209. These actions were a true commitment toward the robbery, which would be in progress the moment the would-be robber entered the bank thus attired and equipped. That stage of the crime had not been reached by Harper and Sharrieff; their actual embarkation on the robbery lay as much as 90 minutes away from the time when Harper left money in the ATM, and that time had not expired when they were apprehended.

*Still* provides further support for our conclusion. There, we relied upon *Buffington* to reverse a similar conviction for attempted bank robbery. The defendant in that case was seen sitting in a van approximately 200 feet from the supposed target bank. In the van he had a fake bomb, a red pouch with note demanding money attached to it, a po-

---

**3.** We concluded that the evidence was insufficient on the intent element because the defen-

dants may have been intending to rob another bank or the store.

lice scanner, and a notebook containing drafts of the note. He also had been seen putting on a blonde wig while sitting in the van. The defendant's intent was clear; he told police that he had been about to rob the bank and "[t]hat's what [he] was putting the wig on for." *Still*, 850 F.2d at 608. We concluded, however, that the evidence was insufficient to establish that the defendant had taken a substantial step toward commission of the offense. "Our facts do not establish either actual movement toward the bank or actions that are analytically similar to such movement." *Id.* at 610. Defendant Still, like the defendants here, was sitting in his vehicle when the police approached. As in *Still*, we conclude that the crime was too inchoate to constitute an attempt.

When criminal intent is clear, identifying the point at which the defendants' activities ripen into an attempt is not an analytically satisfying enterprise. There is, however, a substantial difference between causing a bill trap, which will result in the appearance of potential victims, and moving toward such victims with gun and mask, as in *Moore*. Making an appointment with a potential victim is not of itself such a commitment to an intended crime as to constitute an attempt, even though it may make a later attempt possible. Little more happened here; this case is more like *Buffington* and *Still* than it is like *Moore*. Accordingly, we reverse the appellants' convictions for attempted bank robbery.

## B. Conspiracy

■ Harper and Sharrieff also contend that there was insufficient evidence to support their convictions for conspiracy to rob the Bank of America. We reject their argument, because the overt act required as an element of conspiracy need not have as immediate a connection to the intended crime as the "substantial step" required for an attempt. It is enough that the overt act is "taken to implement the agreement." *United States v. Litteral*, 910 F.2d 547, 550 (9th Cir.1990).

■ There is no doubt that there was sufficient evidence that the defendants committed one or more overt acts to implement

their agreement to rob the Bank of America. Harper conducted the ATM transaction that resulted in the bill trap. With regard to Sharrieff, it was reasonable for the jury to infer that he provided Harper with the card she used in causing the bill trap because the card belonged to his girlfriend and was in his possession when the police arrived. Moreover, there was testimony indicating that Sharrieff was the defendant who had exited the vehicle and leaned over the place where the guns were hidden under the nearby bush. There was evidence that the guns had not been there long; they were not rusted or covered with grass, leaves or debris. The jury could rationally find that Sharrieff or one of the other two conspirators had placed them there. The requirement of at least one overt act was clearly met.

The other elements of the crime of conspiracy are: "an agreement to engage in criminal activity, ... and ... the requisite intent to commit the substantive crime." *Id.* The existence of an agreement to rob the bank can be inferred from circumstantial evidence. *See id.* at 550. The circumstantial evidence that the appellants agreed to rob the bank is very strong. Harper, familiar with the service procedures for ATM machines, caused a situation that would require service technicians to be dispatched to service the Bank of America ATM. She and Sharrieff, along with a third codefendant, then were apprehended sitting in a vehicle parked near the bank with a view of the ATM. They were in possession of items that would be useful in robbing the bank: duct tape, a stun gun, latex surgical gloves, and two loaded handguns that had been concealed in a place where they were readily retrievable. All of these facts were probative of an agreement to rob the bank.

This same circumstantial evidence also supports a finding that the appellants intended to rob the Bank of America when the service technicians arrived. The appellants' argument that *Buffington* precludes this inference is misplaced. In *Buffington*, we held that the conspiracy conviction, as well as the attempted bank robbery conviction, had to be reversed because there was insufficient evidence to support the intent element of either

crime.[4] *Buffington*, 815 F.2d at 1302–03. The primary reason we considered the evidence of intent to be insufficient in *Buffington*, however, was that "the evidence [was] focused no more on [the bank] than on other nearby institutions." *Id.* at 1302. In this case, the bill trap focuses the evidence on the Bank of America.

Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found each of the elements necessary for the conspiracy convictions beyond a reasonable doubt. We therefore affirm those convictions.

### C.  Use of a Firearm

■ Sharrieff contends that his conviction for using or carrying a firearm during and in relation to a crime of violence[5] must be reversed because of insufficient evidence.[6] We reject his argument.

■ To obtain a conviction under section 924(c)(1), the government must prove: (1) the firearm at issue was "related to" the underlying crime; and (2) the defendant "used" or "carried" the firearm. *United States v. Torres–Medina*, 935 F.2d 1047, 1048–49 (9th Cir.1991). To establish the second element, the prosecution must prove only that the gun was "available" to the defendant. *Id.* at 1049.

■ In this case, the evidence amply supports both elements. A rational jury could find that the handguns located underneath the bush where Sharrieff had been seen bending down were related to the conspiracy of which the defendants were convicted. A rational jury also could conclude that the two handguns were available to each of the three defendants. The guns were located five to six feet from the car. It is reasonable to infer that the defendants planned to retrieve the guns at the time that they observed the

service technicians enter the bank, so long as a successful robbery appeared feasible at that point.

■ We do not accept Sharrieff's argument that our decision in *United States v. Bernal*, 719 F.2d 1475 (9th Cir.1983), establishes that three people cannot each be found to have "used" two firearms. Not only did *Bernal* deal with different statutory language, but the decision was based upon state law, which made it unlawful for a person to have a handgun concealed "upon his person" or to "have in his possession" a concealable weapon. *Id.* at 1479. We held that, under Nevada precedent, there was insufficient evidence to convict Bernal of this offense when he was simply one of two persons in a vehicle in which the gun had been found. *Id.* The decision does not depend, as ours does, on whether the gun was "available."

We have held that the same guns may be available to two defendants at the same time, supporting convictions of both under section 924(c). *United States v. Winslow*, 962 F.2d 845, 853 (9th Cir.1992). Other circuits have upheld convictions based on availability of a gun that was equally or more available to another participant. *See United States v. White*, 985 F.2d 271, 273–74 (6th Cir.1993) (gun in coat draped over chair in which another defendant was sitting); *United States v. Wesley*, 990 F.2d 360, 365 (8th Cir.1993) (gun found on floor between defendant and codefendant); *United States v. Joseph*, 892 F.2d 118, 124–26 (D.C.Cir.1989) (gun in bag carried by defendant's companion). It is clear, therefore, that there is no legal barrier to the jury's finding in the present case that the guns under the bush were available to both Sharrieff and Harper.

Because a rational jury could have found all of the essential elements of the crime beyond a reasonable doubt, we affirm appel-

---

**4.** As we have already noted, we also held in that case that the evidence was insufficient as to the substantial step element of attempt.

**5.** The underlying crime of violence charged was the conspiracy. Conspiracy to rob a bank is a crime of violence for purposes of section 924(c)(1). *United States v. Mendez*, 992 F.2d 1488, 1491 (9th Cir.), *cert. denied*, —— U.S. ——,

114 S.Ct. 262, 126 L.Ed.2d 214 (1993). The use of a firearm conviction, therefore, can be affirmed despite our reversal of the appellants' convictions for attempted bank robbery.

**6.** Harper does not address this issue in her brief, although she adopts Sharrieff's arguments pursuant to Fed.R.App.P. 28(i).

lants' convictions for use of a firearm during and in relation to a crime of violence.

## III. Jury Instructions

### A. Attempt

Harper argues that the district judge improperly instructed the jury on what constitutes a substantial step to support an attempt conviction. We need not address this question in light of our reversal of her attempt conviction.

### B. Use of a Firearm

■ Harper also argues that the district judge committed reversible error by failing to instruct the jury that it must determine that the handguns found in the bushes were used or carried *during and in relation to* the underlying crime of violence. We review this issue only for plain error because Harper did not object to the instruction at trial. Fed. R.Crim.P. 52(b); *United States v. Olano*, —— U.S. ——, ———--———, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508 (1993).

The district judge instructed the jury as follows:

> The defendants are charged in count three of the indictment with using or carrying a firearm during and in relation to a crime of violence in violence [sic] of Section 924(c). In order for each of the defendants to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt; first, defendants committed the crime of attempted bank robbery [7] as charged in the indictment; and second, defendants knowingly used or carried a firearm while committing that crime.

The district judge also instructed the jury that " 'uses or carries a firearm' means having a firearm or firearms available *to assist or aid in the commission of the crime alleged in the indictment.*" (Emphasis added). We need not determine whether these instructions together adequately conveyed to the jury the necessity of determining that

the defendants used the handguns "in relation to" the conspiracy under *United States v. Mendoza*, 11 F.3d 126, 128–29 (9th Cir. 1993). Even if the instructions were deficient, Harper cannot establish plain error unless the deficiency affected her substantial rights. She must show that the error was prejudicial. *Olano*, —— U.S. at ——, 113 S.Ct. at 1778. We conclude that no plain error occurred because Harper has not shown "a significant possibility of acquittal" had a different instruction been given. *See United States v. Steward*, 16 F.3d 317, 320 (9th Cir.1994).

## IV. Sentencing Guidelines

When calculating Harper's sentence, the district judge increased her offense level pursuant to both section 3B1.1(c) (aggravating role) and section 3B1.3 (special skills). The government concedes that resentencing is necessary because the district judge erred in granting both adjustments together. *See* U.S.S.G. § 3B1.3 (adjustment for special skill cannot be employed in addition to adjustment for aggravating role). Nevertheless, the government asserts that on remand the district judge can grant one or the other adjustment. Harper asserts that neither adjustment was appropriate. On the present state of the record, we agree with Harper.

### A. Aggravating Role

Harper challenges the district court's determination that she was "an organizer, leader, manager or supervisor in criminal activity." This adjustment cannot be upheld on this record because the district judge applied an erroneous test in determining this issue.

■ For an increase under section 3B1.1 to be appropriate, there must be evidence to support a finding that the defendant occupied one of the four specified roles, not merely that the defendant was more culpable than others who participated in the crime. *United States v. Hoac*, 990 F.2d 1099, 1111 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 392 (1994). More-

---

7. The reference to attempted bank robbery was erroneous; the predicate crime of violence for the § 924(c) charge was the conspiracy to rob the bank. The district judge later implicitly corrected this error when she noted that "[t]he offense alleged in count one of the indictment, conspiracy to commit armed bank robbery, is a crime of violence."

over, to sustain a finding that a defendant in fact played one of the four specified roles, there must be evidence that the defendant "exercised some control over others involved in commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime." *United States v. Mares–Molina*, 913 F.2d 770, 773 (9th Cir. 1990).

■ In this case, the sentencing judge made no finding that Harper controlled or organized the other members of the conspiracy. At the sentencing hearing, she offered only the following to explain the adjustment:

> It is clear to me that the defendant's special skills not only justify the enhancement with regard to that special provision of the guidelines, but also give the basis for the leadership enhancement. It seems pretty plain, based upon the evidence that I'm aware of that without her expertise, there would not have been an attempted robbery or the conspiracy of which she has been found guilty.

An inference that Harper must have organized the people involved in the conspiracy because of her knowledge of ATM service procedures is untenable. Moreover, the judge did not purport to make such an inference. Instead, she applied a "but for" test: if the crime could not have been completed but for Harper's knowledge and participation, then she qualifies as a leader. That, however, is not the test that we have established for determining whether the aggravating role adjustment can be applied. *See Mares–Molina*, 913 F.2d at 773.

The presentence report is not much more helpful. The following appears in the report:

> Adjustment for Role in the Offense: ... Harper, being a former employee of both Bank of America and Pedcom, organized this scheme. Information obtained during the FBI investigation indicates that she was instrumental in planning and organizing the robbery. Therefore, the two-level enhancement applied.

No reference is made to any specific facts that indicate that Harper exercised control over or organized others in committing this crime. Instead, there is the bare reference to "information obtained during the FBI investigation." Although evidence may exist to support an inference that Harper occupied a leadership role in this conspiracy, the sentencing judge did not mention it when imposing sentence.

Upon remand, the district judge is instructed not to impose the aggravating role adjustment without making specific findings that Harper qualifies for the adjustment under the test we announced in *Mares–Molina*.

## B. Special Skills

■ Harper also contends that an increase in her sentence for using "special skills" was not warranted. We agree.

Section 3B1.3 allows a two-level increase "[i]f the defendant ... used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." The government contends that the knowledge Harper gained as an employee of both Bank of America and Pedcom (an ATM service company) qualifies as a special skill under the Guideline. Specifically, the government points to Harper's knowledge of ATM service procedures, her knowledge of how ATM technicians enter ATM rooms and open ATM vaults, her knowledge of how to disarm ATM alarm systems, and her knowledge of when ATM vaults are likely to contain large amounts of cash. This knowledge, however, is not sufficient to sustain an adjustment for the use of special skills.

Application note 2 to the Guideline explains that:

> "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.

What Harper learned during her employment with the Bank of America and Pedcom cannot be reasonably equated with the skills developed and possessed by "pilots, lawyers, doctors, accountants, chemists and demolition experts." The application note stresses that "special skills" usually require *substantial* education, training or licensing. If Harper's

knowledge, gained from her former employment, were sufficient to sustain the adjustment for special skills, then almost any insider who uses her special knowledge of her own institution and its procedures to commit a crime would be eligible for the enhancement. The application note clearly indicates that the Sentencing Commission did not intend that result.

We have held that a defendant's preexisting education and skill in printing was insufficient to justify imposition of the special skills adjustment for the crime of photographing federal reserve notes. *United States v. Green,* 962 F.2d 938, 944–45 (9th Cir.1992). We noted in *Green* that "[c]ourts have generally rejected application of the guideline merely because the offense was difficult to commit or required a special skill to complete." *Id.* at 944. In *Green,* we also cited approvingly to *United States v. Young,* 932 F.2d 1510 (D.C.Cir.1991), in which the District of Columbia Circuit rejected an argument that all people who manufacture PCP are subject to the "special skill" adjustment simply because most people in the general public do not possess the skill to manufacture PCP. The *Young* court stated:

> "[T]he syllogism ... cannot easily be confined to the manufacture of PCP. Employing the same logic, the government could also argue that a § 3B1.3 enhancement is due whenever an offense involves some skill that the general public does not possess: counterfeiting U.S. Currency or manufacturing a bomb are two likely examples. In essence, the government is contending that if the offense is a difficult one to commit, the mere ability to commit it evidences a "special skill" sufficient to justify an enhancement under § 3B1.3.

*Young,* 932 F.2d at 1512–13. That court also noted that "[n]othing in the commentary suggests that § 3B1.3 applies to a criminal who, like appellant, bones up on the tricks of his trade and becomes adept at committing a crime that the general public does not know how to commit." *Id.* at 1514. We agree.

In light of *Green* and *Young,* we conclude that Harper's knowledge of ATM service procedures does not constitute a "special skill" for the purposes of U.S.S.G. § 3B1.3.[8]

## CONCLUSION

We reverse both Harper's and Sharrieff's convictions for attempted bank robbery. We affirm their convictions for conspiracy and use of a firearm during and in relation to a crime of violence. We also conclude that Harper is not subject to an upward adjustment in sentencing for use of a special skill. Moreover, the district judge on remand shall not impose an upward adjustment for her role in the offense without making a proper finding that she was an organizer, leader, or manager or supervisor in criminal activity.

No. 93–50527: AFFIRMED in part, REVERSED in part, and REMANDED for resentencing.

No. 93–50717: AFFIRMED in part, REVERSED in part, and REMANDED for sentencing.

---

8. We acknowledge that the First Circuit, in a case very similar to this one, has held that knowledge of ATM machines and their service procedures can constitute a special skill under section 3B1.3. *See United States v. Aubin,* 961 F.2d 980 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 248, 121 L.Ed.2d 180 (1992). In that case, however, the defendant was a trained ATM repairman who "held a Rhode Island license as an Electrician Limited Journeyman and also held an alarm license from the Rhode Island Alarm Licensing Authority." *Aubin,* 961 F.2d at 984. Moreover, "[d]efendant's electrical skills had won him an award from the New England Institute of Technology for outstanding achievement and technology." *Id.* Harper does not have any similar credentials and therefore *Aubin* is not entirely instructive. We conclude, therefore, consistent with the principles established in *Green,* that Harper did not possess a "special skill." We leave for another day the decision whether licenses such as those possessed by the defendant in *Aubin* would compel a different conclusion.